Angel Victor VASQUEZ, Appellant,

v.

STATE of Texas, Appellee.

No. 11–07–00101–CR.

Court of Appeals of Texas,
Eastland.

June 26, 2008.

Rehearing Overruled July 24, 2008.

Amos W. (Trey) Keith, Asst. Dist. Atty., Sweetwater, TX, for Appellant.

Dana W. Cooley, Dist. Atty., Snyder, TX, for Appellee.

Panel consists of WRIGHT, C.J., McCALL, J., and STRANGE, J.

## OPINION

RICK STRANGE, Justice.

Angel Victor Vasquez was indicted for capital murder. The jury convicted him of the lesser included offense of causing serious bodily injury to a child and assessed his punishment at ninety-nine years confinement and a $10,000 fine. We affirm.

### I. *Background Facts*

Vasquez and Tracy Luna were common-law married. They had two daughters: four-year-old B.N.L.V. and two-year-old Natalie Vasquez. During the early morning hours of May 11, 2005, emergency officials were dispatched to Luna and Vasquez's house because of a report that a two-year-old child was having cardiac arrest. Paramedics arrived and administered CPR to Natalie. She had no electrical activity in response to an EKG, and so she was taken to the hospital. Because Natalie had numerous bruises, paramedics requested that a law enforcement officer meet them at the emergency room. Natalie was pronounced dead at the hospital. The medical examiner's office conducted an autopsy and determined that Natalie died of complications of blunt force trauma and neglect.

Luna and Vasquez were indicted for capital murder. The State alleged that they knowingly and intentionally caused Natalie's death by failing to provide her with medical care or adequate food. The State was subsequently allowed to amend the indictments to include a contention that Luna and Vasquez had a duty to act because they were Natalie's parents. Luna and Vasquez were tried together. The jury acquitted them of capital murder but found them guilty of the lesser included offense of intentionally or knowingly causing serious bodily injury to a child. The jury assessed each defendant's punishment at ninety-nine years confinement and a $10,000 fine.

### II. *Issues on Appeal*

Vasquez challenges his conviction with six issues. Vasquez argues that the evidence was legally and factually insufficient,

that the trial court erred by allowing the State to amend the indictment, that the trial court erred by including the lesser included offenses of injury to a child, and that the trial court erred by admitting hearsay evidence. Finally, Vasquez adopts by reference any issues raised by Luna in her brief.

### III.   *Analysis*

#### A.   *Was the Evidence Legally and Factually Sufficient?*

Vasquez argues that the evidence is insufficient because the evidence of his intent establishes no more than criminal negligence.

#### 1.   *Standard of Review.*

To determine if the evidence is legally sufficient, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim.App.2000). The jury was the sole judge of the credibility of the witnesses and the weight to be given their testimony. TEX.CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979). The jury may choose to believe or disbelieve all or any part of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim.App.1986).

To determine if the evidence is factually sufficient, the appellate court reviews all of the evidence in a neutral light. *Watson v. State*, 204 S.W.3d 404, 414 (Tex.Crim.App. 2006). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and

preponderance of the conflicting evidence. *Id.* at 414–15.

The appellate court reviews the factfinder's weighing of the evidence and cannot substitute its judgment for that of the factfinder. *Cain v. State*, 958 S.W.2d 404, 407 (Tex.Crim.App.1997); *Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Crim.App.1996). Due deference must be given to the factfinder's determination, particularly concerning the weight and credibility of the evidence. *Johnson v. State*, 23 S.W.3d 1 (Tex.Crim.App.2000); *Jones v. State*, 944 S.W.2d 642 (Tex.Crim.App.1996).

█  A person commits an offense if he intentionally or knowingly causes injury to a child by act or by omission if he has a duty to act. TEX. PENAL CODE ANN. § 22.04 (Vernon Supp.2007). Parents have a duty to care for, to control, to protect, and to provide medical care to their children. TEX. FAM.CODE ANN. § 151.001(a)(2), (3) (Vernon Supp.2007). Injury to a child is a result of conduct offense. *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex.Crim.App. 1985). Therefore, the State must prove not only that Vasquez failed to provide adequate food and medical care but also must prove that he intentionally or knowingly caused Natalie's injury. *Johnston v. State*, 150 S.W.3d 630, 634 (Tex.App.–Austin 2004, no pet.). A person acts intentionally when it is his conscious desire to engage in the conduct or to cause the result. TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003). A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003). Serious bodily injury is injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss of impairment of the function of any bodily member or organ.

TEX. PENAL CODE ANN. § 1.07(a)(46) (Vernon Supp.2007).

### 2. Legal Sufficiency.[1]

■ Natalie was born on December 2, 2002, and was a normal size baby. Dr. Gustavo Gross saw her for a two-week checkup. She was doing well, had gained some weight since birth, and weighed 7.7 pounds. Dr. Gross did not see her again as a patient until January 14, 2004. Even though Natalie was thirteen months old, she only weighed 13.4 pounds. Natalie appeared dehydrated, malnourished, and hyperglycemic. Dr. Gross made arrangements for Natalie to be hospitalized and seen by a specialist in Lubbock.

Dr. James V. Higgins was responsible for her treatment in Lubbock. Dr. Higgins testified that when Natalie arrived there were questions about her liver function because of test results but that over two days her liver enzymes had dropped dramatically. Dr. Higgins testified that essentially all they did was feed Natalie. During the forty-eight hours she was hospitalized, Natalie took in more food than expected, and she achieved a significant weight gain, going from 5.8 to 6.4 kilos. This equates to a weight gain of approximately 1.3 pounds. Dr. Higgins described Natalie as a hungry child who wanted to eat.

Dr. Higgins saw Natalie two weeks after her hospital discharge for a follow-up visit. She looked good. Dr. Higgins recommended replacing Natalie's milk with PediaSure to provide more calories. He did not recommend withholding solid food, but Luna began telling relatives that Natalie could not handle solid food. Later, Natalie was only allowed to eat small amounts of solid food.

Dr. Gross also saw Natalie shortly after her discharge. He testified that he stressed to Luna the need to keep any follow-up appointments with the specialist and that he told her to take Natalie back to the doctor if she started to lose weight. Dr. Gross next saw Natalie on April 26, 2004. Natalie had the worst case of impetigo that he had ever seen. Dr. Gross testified that he was concerned. He treated Natalie with an ointment and an oral antibiotic. He saw her for follow-up visits on April 27 and April 28. The April 28 visit was the last time he saw Natalie as a patient. Dr. Gross testified that, if he had seen a child that looked like Natalie did when she arrived at the emergency room, he would have called the authorities. Dr. Gross testified that Luna and Vasquez should have been extremely concerned about Natalie's weight, that he would have expected them to recognize impetigo when it returned, and that he would have expected them to seek medical treatment for it. He also testified that they were neglectful for not doing so.

Dr. Thomas Lloyd Kerr saw Natalie when paramedics brought her body to the emergency room. He testified that, if the authorities had not already been alerted, her injuries would have required him to do so. She had multiple bruises on her face, abdomen, back, hips, left leg, and behind her left ear. These bruises were too well-defined to have been caused by a fall. Natalie had a decubitus ulcer on her sacrum that went through the epidermis to the bone. It was infected, and it would have been painful for her. When Dr. Gross saw Natalie in April 2004, she

---

1. Vasquez challenges the admission of a counselor's testimony by separate issue. We are required to consider a legal sufficiency challenge before a challenge to the admission of evidence. To simplify our review, we are not considering the challenged evidence in our legal or factual sufficiency analysis.

weighed twenty-two pounds. When Natalie died on May 11, 2005, her weight had dropped to seventeen pounds.

Justice of the Peace Debra Boyd was called to the hospital. She saw Natalie's body and testified that a parent should have known Natalie needed medical attention. Sheriff Darren Jackson was one of the law enforcement officers dispatched to the hospital, and he too saw Natalie's body. He testified that she looked six months old; that he would have realized she needed medical attention; and that, if he had seen Natalie in this condition, he would have taken custody of her and would have taken her to the emergency room. Sheriff Jackson contacted CPS and requested its assistance because he wanted to have Luna and Vasquez's oldest child removed from their home.

Judge Boyd authorized an autopsy. Dr. Sridhar Natarajan, Chief Medical Examiner for Lubbock County and the doctor responsible for Natalie's autopsy, testified that there were several indications that Natalie had not been fed properly. These included the loss of body fat, reduced thickness of muscle, fluid accumulating in the peritoneal cavity, and the brittleness of her hair. During the autopsy, doctors identified twenty-four well-healed scars, sixty-one bruises, two previously fractured ribs, and a staph infection in her blood. They found little to no fat on her chest wall and around her bowel. The medical examiner's office determined that the cause of death was complications from blunt force trauma and neglect.

Even Vasquez's expert Dr. Robert Lloyd White agreed that Natalie was malnourished, that she died from protein-calorie malnutrition, and that she had extensive bruises of a suspicious nature. He would have included battered baby syndrome as a contributing condition and homicide as the manner of death if he had done the autopsy. He believed that Natalie needed medical attention.

Vasquez knew that Natalie was losing weight. He and Luna talked about it. He also knew that if he took Natalie to a doctor they would see her bruises and might reach an opinion about what he had been doing to her. He knew about Natalie's open sore. Vasquez's mother talked to him and Luna about Natalie's weight and she told them to take Natalie to a specialist because she could see that there was something wrong with Natalie. Vasquez's father thought they were taking Natalie to the doctor but found out after her death that this was untrue.

Kerrie Blair, a CPS investigator, went to Luna and Vasquez's residence. She asked to see the cream Luna told law enforcement officials she had been using to treat Natalie's ulcer. Luna told her that it had been thrown away and was unable to produce any medication. Luna claimed that she had also been using Neosporin to treat Natalie's ulcer but told Blair that they had been out of it for a couple of days. Luna agreed that she did not have any of the cream she had previously received from Dr. Gross but claimed that Blair was lying when she said that there was no Neosporin in the house.

Blair testified that PediaSure was available free of charge from the WIC program. She testified that she learned during her investigation that Luna had gotten into a disagreement with the WIC nurse and that she stopped going to the WIC office. Blair testified that she learned Natalie was not allowed to get food when she wanted and that, if she attempted to do so, she was punished. Luna and Vasquez's two dogs, however, appeared well-fed.

Vasquez gave Sheriff Jackson a statement the day Natalie died. Vasquez said that Natalie had always been small, had

trouble gaining weight, and had suffered from health problems since her birth. He said Natalie was clumsy, bruised easily, scratched herself, and bit her lip. He denied spanking his kids. At trial, Vasquez testified that Natalie ate a lot and that he did not take her to a doctor because he did not see any sign that anything was wrong with her. He knew that Natalie was losing weight, although he denied that any doctor ever told them to take Natalie to the doctor if this occurred. He testified that he did not take Natalie to the doctor for her bruises because he did not think they bothered her enough to go to the doctor.

The evidence is legally sufficient. Vasquez argues that there was no evidence that he was aware with reasonable certainty that Natalie's death would have been prevented by taking her to the doctor. This is not the specific question we must address because Vasquez was not convicted of capital murder. The question is whether Vasquez intentionally or knowingly caused Natalie serious bodily injury by failing to provide adequate food or medical care. Natalie died of malnutrition and had a number of other health-related issues. Vasquez knew that Natalie had lost weight. The jury could have believed the doctors' testimony that they told Luna and Vasquez to take Natalie back to the doctor if she lost weight. Vasquez knew that Natalie had an open ulcer with exposed bone, and Vasquez had been encouraged by relatives to feed Natalie more or to take her to a doctor. The number of bruises and scars on Natalie's body would have caused any healthcare provider concern and may explain why he did not take Natalie to the doctor and why Luna and Vasquez lied to relatives about doing so. Vasquez was not prevented from taking Natalie to the doctor, acquiring medication for her ulcer or impetigo, or feeding her. Each of these was the result of a conscious decision with knowledge that Natalie's health was being risked. Furthermore, there was testimony from impartial witnesses that Natalie's appearance alone indicated the need for medical attention—testimony definitively corroborated by the emergency room photographs.

### 3. Factual Sufficiency.

■ Vasquez argues alternatively that, if the evidence is legally sufficient, it is factually insufficient. Vasquez notes that Natalie was small; but he points to testimony that Luna was only 4'10" and weighed eighty-five pounds, that Natalie ate until she was full, and that Natalie was only denied sweets between meals. The jury as the factfinder was authorized to resolve any conflicts in the evidence concerning Natalie's care and treatment. Consequently, the mere fact that Vasquez denied any wrongdoing does not make the evidence factually insufficient. Issue one is overruled.

### B. Did the Trial Court Err by Allowing the State to Amend the Indictment?

■ Vasquez argues that the trial court erroneously allowed the State to amend the indictment because it charged him with additional felony offenses in violation of TEX.CODE CRIM. PROC. ANN. art. 28.10(c) (Vernon 2006) and that the trial court erred further by including lesser included charges of injury to a child in the jury charge in violation of TEX.CODE CRIM. PROC. ANN. art. 1.05 (Vernon 2005). The State responds that the amendment merely added a missing element to the charged offense and, therefore, did not allege a new offense.

Vasquez was indicted for capital murder. The State alleged that Vasquez intentionally or knowingly caused Natalie's death by failing to provide her with adequate food or medical care and that, at the time

of her death, Natalie was less than six years old. The State filed a motion to amend the indictment by adding an allegation that Vasquez had a duty to act because he was Natalie's parent. The trial court granted this motion over Vasquez's objection.

Vasquez reasons that this amendment charged him with new offenses because the amended indictment exposed him to additional lesser included offenses and that it was error to include these new offenses in the jury charge because he was not properly indicted for them. Vasquez acknowledges that the original indictment vested the trial court with jurisdiction, that a conviction for murder would have been authorized under it, and that the indictment could have possibly authorized convictions for the lesser included offenses of manslaughter and criminally negligent homicide. But he argues that it would not have authorized a conviction for injury to a child by omission because it did not allege a duty to act. Vasquez concludes that the amendment alleged an additional or different statutory offense because the duty allegation now authorized the submission of injury to a child by omission.

The Court of Criminal Appeals has interpreted Article 28.10(c) to mean that an amended indictment must allege a different *statutory* offense, not merely add a missing element or change the name of a complainant before it violates the statute. *Flowers v. State,* 815 S.W.2d 724, 728–29 (Tex.Crim.App.1991). The amendment, on its face, did not allege a different statutory offense. Vasquez does not refer us to, nor have we been able to locate, a case that holds that an indictment is improper if it increases the scope of potential lesser included offenses or that it is improper to include lesser included offenses raised by an amended indictment in the jury charge.

Vasquez's analysis would require the State to return to the grand jury every time a proposed amendment increases the possible lesser included offenses that *might* be raised by the evidence and, therefore, that *might* be included in the proposed charge. Article 28.10(c) imposes no such obligation, and we can divine no requirement from the general principles governing indictments. If Vasquez's concern is that he did not receive the benefit of a grand jury review of the injury to a child allegations, we note that the State is not required to make specific allegations of lesser included offenses. *See Eastep v. State,* 941 S.W.2d 130, 134 (Tex.Crim.App. 1997) (the greater offense necessarily includes all the lesser included offenses whether each of their constituent elements are alleged in the wording of the indictment on the greater offense or not). Consequently, we cannot say that the grand jury was required to specifically address the possibility that injury to a child might become a relevant allegation. Moreover, because the evidence was legally and factually sufficient to support the conviction, a grand jury review would have provided Vasquez with no clear benefit. If Vasquez's concern is that the amendment impacted his ability to prepare a defense, this is better handled by a motion for continuance. Issues two and three are overruled.

*C. Did the Trial Court Erroneously Admit Hearsay Evidence?*

The State called Leann Hicks as a witness. Hicks was a licensed professional counselor and was asked by CPS to provide grief counseling to Vasquez's oldest daughter, B.N.L.V. The trial court conducted a hearing outside the presence of the jury to determine the admissibility of statements made to Hicks by B.N.L.V. The trial court held that these statements were admissible pursuant to TEX.R. EVID.

803(4).[2] Vasquez argues that the trial court erred when it admitted B.N.L.V.'s statements because a licensed professional counselor is per se neither a medical diagnostician nor a medical treatment provider.

We review the trial court's admission of evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex.Crim.App.2000). A trial court does not abuse its discretion if its ruling is within the zone of reasonable disagreement. *Id.* We will uphold a trial court's evidentiary ruling if it is reasonably supported by the record and is correct under any theory of applicable law. *Martin v. State*, 173 S.W.3d 463, 467 (Tex.Crim.App. 2005).

Texas courts have allowed a wide range of non-physicians to testify under Rule 803(4). *See, e.g., Taylor v. State*, No. 01–05–01183–CR, 2007 WL 2214859 (Tex. App.–Houston [1st Dist.] Aug. 2, 2007, pet. granted) (licensed professional counselor); *Horner v. State*, 129 S.W.3d 210, 219 (Tex. App.–Corpus Christi 2004, pet. ref'd) (medical social worker); *Wilder v. State*, 111 S.W.3d 249, 256 (Tex.App.–Texarkana 2003, pet. ref'd) (licensed professional counselor); *Puderbaugh v. State*, 31 S.W.3d 683, 685 (Tex.App.–Beaumont 2000, pet. ref'd) (clinical social worker); *Gohring v. State*, 967 S.W.2d 459, 461 (Tex.App.–Beaumont 1998, no pet.) (play therapist working under the supervision of a licensed psychologist); *Moyer v. State*, 948 S.W.2d 525, 527–28 (Tex.App.–Fort Worth 1997, pet. ref'd) (paramedic); *Torres v. State*, 807 S.W.2d 884, 886–87 (Tex.App.–Corpus Christi 1991, pet. ref'd) (emergency room nurse); *Macias v. State*, 776 S.W.2d 255, 258–59 (Tex.App.–San Antonio 1989, pet. ref'd) (psychologist).

Vasquez essentially argues that these decisions are wrong and asks us to follow decisions from the Austin Court of Appeals that he contends stand for the proposition that Rule 803(4) is limited to medical treatment and, therefore, does not encompass mental-therapeutic treatment unless it is part of diagnosing and treating a medically treatable condition, such as schizophrenia. Vasquez cites *Perez v. State*, 113 S.W.3d 819 (Tex.App.–Austin 2003, pet. ref'd) and *Moore v. State*, 82 S.W.3d 399 (Tex.App.–Austin 2002, pet. ref'd.). In *Moore*, the court held that the trial court erred by admitting testimony from a clinical social worker under Rule 803(4) because the State failed to carry its burden of proof to establish the applicability of the exception. *Id.* at 404–05. The court reached a similar result in *Perez*, in a case involving a counselor's testimony. 113 S.W.3d at 829–30. We note, however, that in its most recent decision in this area, the Austin Court affirmed the admission of a clinical social worker's testimony under Rule 803(4). *Gibson v. State*, No. 03–07–00191–CR, 2007 WL 4207824 (Tex.App.–Austin Nov. 29, 2007, no pet.) (mem. op., not designated for publication).

There is some dicta in the *Perez* decision that supports Vasquez's contention. For example, the court wrote that the challenged statements were inadmissible because the social worker "was not shown to be a medical professional" and because "the statements were made during an extended period of counseling and did not

---

**2.** This exception allows for admission of the following hearsay statements:

(4) Statements for Purposes of Medical Diagnosis or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

possess the guarantees of trustworthiness on which the medical diagnosis and treatment exception to the hearsay rule is founded." 113 S.W.3d at 827. One can, however, draw too broadly with this brush. Even in *Moore*, the court noted that in child abuse cases the victim's statement identifying their attacker is admissible because the child's treatment begins with removing the child from the abusive setting. 82 S.W.3d at 403. Clearly then, the court recognized that Rule 803(4) will in appropriate circumstances have broader application than statements made to medical doctors or similar medical professionals for the treatment of a medically-treatable condition.

■ We believe the Austin Court is advocating a two-part analysis whenever the State seeks to use Rule 803(4) beyond statements made to medical doctors. First, the State must prove that the witness has the training to diagnose or treat a medical condition. In this context, a medical condition would necessarily include illnesses such as schizophrenia as contended by Vasquez, but it would also encompass conditions such as child abuse,[3] post-traumatic stress disorder, and depression.[4] Second, the State must prove that the statement was made as part of the diagnosis or treatment process.

The trial court did not abuse its discretion by finding that Hicks's testimony was admissible. Hicks was licensed by the State of Texas as a professional counselor and had seventeen years experience. She had a bachelor's degree in sociology and a master's degree in education with an emphasis in guidance and counseling. Hicks was licensed to supervise other counselors, which means that she had completed three

thousand hours of post-graduate work under a licensed supervisor.

Hicks testified that she took steps to determine whether B.N.L.V. understood that truthfulness would help her improve, that she verified B.N.L.V.'s appreciation of the difference between the truth and a lie, and that B.N.L.V. recognized that the counseling process was helping her. Hicks testified that she utilized B.N.L.V.'s statements to diagnose and treat B.N.L.V. and that this is the type of information upon which counselors normally rely. She said that she ultimately diagnosed B.N.L.V. with post-traumatic stress disorder, adjustment disorder mixed with anxiety, depression, and bereavement.

This was sufficient evidence to inform the trial court's exercise of discretion and to address the concerns raised by the Austin Court. The State carried its burden to establish that Hicks had the education and training to diagnosis and treat B.N.L.V., that B.N.L.V.'s statements to her were part of the diagnosis and treatment process, and that B.N.L.V. adequately understood the need for truthfulness. Issues four and five are overruled.

*D. Issues Adopted by Reference to Luna's Brief.*

Vasquez has adopted by reference all issues raised by Luna in her brief pursuant to TEX.R.APP. P. 9.7. The State argues that this is inappropriate because Luna's appeal is not part of this case but is a separate appeal. This issue we need not decide because by separate opinion we have today affirmed Luna's conviction. *Luna v. State*, No. 11–07–00141–CR (Tex. App.–Eastland June 26, 2008, no pet. h.). Thus, even if Vasquez's adoption is appropriate, no error is shown. Vasquez's adoption by reference issue is overruled.

---

**3.** *See, e.g., Fleming v. State*, 819 S.W.2d 237, 247 (Tex.App.–Austin 1991, pet. ref'd).

**4.** *See, e.g., Gibson*, 2007 WL 4207824 at *2.

## IV. *Holding*

The judgment of the trial court is affirmed.