

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

### NO. 02-11-00492-CR

RYKA TELAN HOPPER                                                    APPELLANT

V.

THE STATE OF TEXAS                                                         STATE

----------

FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

A jury convicted Appellant Ryka Telan Hopper of injury to a child causing serious bodily injury and assessed her punishment at forty years' confinement. *See* Tex. Penal Code Ann. § 22.04(a)(1) (West Supp. 2012). In two issues, Appellant argues that the evidence was insufficient and that the trial court erred

---

[1]*See* Tex. R. App. P. 47.4.

by allowing the State to lower its burden of proof during closing jury arguments. We affirm the trial court's judgment.

# I. BACKGROUND

## A. PROLOGUE

On July 12, 2010, Ahnnahka White ("Annie"), who was almost three years old, was rushed to a hospital after having a seizure. When she arrived, she had no detectable heart rate, was in a coma, could not breathe on her own, and "appeared to be critically ill." In short, she was clinically dead. Her body was covered in bruises that appeared to have occurred at different times. The doctors were able to resuscitate Annie, but she tragically never recovered and now is in a persistent vegetative state in an East Texas long-term care facility. After the hospital alerted the authorities, an investigation was begun to determine what happened to Annie.

## B. FACTS LEADING TO JULY 12, 2010

Appellant is Annie's mother. By all accounts, including her own, Appellant is an accomplished liar with a vivid imagination. At the time of Annie's seizure that led to her hospitalization, Appellant was living with her boyfriend, Adam Palmer, and her two daughters, Annie and five-year-old Mahkayla. Palmer, who was charming but had a bad temper, liked to tell people he was a fireman, although he was not. Indeed, Palmer and Appellant lived next door to a fire station. He had a fireman's uniform and kept a stethoscope on the rearview mirror of his truck. Appellant apparently believed Palmer was a fireman even

2

though she never knew him to have a job as a firefighter. Palmer had been convicted of injury to a child before Appellant met him. While Palmer was living with Appellant and her children, he was on parole for this prior offense and was not allowed to live with children.

Appellant had met Palmer in September 2009 and apparently moved in with him shortly thereafter. Their home had internet access, and Appellant was well versed in how to contact people electronically. The relationship was rocky, leading Appellant, Annie, and Mahkayla to move back in with Appellant's mother in early 2010 after Palmer gave Appellant a black eye. Appellant was also aware at this time that Palmer was "under the influence of drugs." Palmer and Appellant continued to see each other, however.

Beginning in January 2010 and continuing through February 2010, Appellant began going to multiple hospitals in search of pain medications for Palmer and muscle relaxers for herself. In February 2010, Appellant called her sister, Tia Miller, and told her to pick her up at Palmer's grandmother's house in Grand Prairie because Appellant had "had enough [and] it was time to go get her." Appellant sounded upset. Miller and Appellant's other sister, Rhonda Rubio, immediately drove from Houston to Grand Prairie because they were concerned for the safety of Appellant, Annie, and Mahkayla.[2] After Miller and

---

[2]Appellant denied that Annie and Mahkayla were with her when she called Miller.

3

Rubio arrived, they couldn't find Appellant. Appellant called Miller, and Appellant's "attitude at that time" was "different," leading Miller to believe Appellant and Palmer had "worked it out." Miller and Rubio did not want to leave without seeing Appellant, but they eventually did based on Appellant's wishes. At some point between January and March of 2010, Appellant also left a voice message for her step-brother, Shaun Holmberg, in which she was crying. Holmberg tried to locate Appellant but could not.

On May 23, 2010,[3] Appellant, her mother, Annie, Mahkayla, Rubio, and Rubio's three sons were driving home after attending a family reunion in Nacogdoches when their car broke down near Marlin. They flagged down a police officer who called a tow truck to tow them to Marlin. After attempting to call several people to come help them, including Appellant's two step-brothers, Appellant called Palmer because "he would be dumb enough to actually come out there and work on the car for cheap." Palmer came to fix the car, and once the car was fixed, Appellant, Annie, and Mahkayla left with Palmer in Palmer's truck. Palmer apparently threatened Appellant and told her that if she didn't move back in with him, he would "make sure your family pays for it." By the time Appellant's mother, sister, and nephews arrived home, Palmer was loading his truck with Appellant's, Annie's, and Mahkayla's possessions. Appellant acted

---

[3]From this point forward, all dates will refer to incidents occurring in 2010.

4

"normal," however. Appellant moved back in with Palmer and brought Annie and Mahkayla with her.[4]

In June, Appellant sent Holmberg a text message stating that Annie could not walk. A few hours later, Appellant sent a second text to Holmberg saying that "the problems were cleared up." Also in June, Carla Hamilton, Palmer's ex-girlfriend, was at Appellant and Palmer's house for a play date with Appellant's daughters and Alyssa, a two-year-old girl Hamilton was baby-sitting. Appellant told Hamilton that Annie recently had a seizure and she was taking Annie to a neurologist to determine the cause. A few weeks later, Hamilton and Alyssa again were at Appellant and Palmer's home. Hamilton noticed that Annie "was just laying [sic] on the couch" and was "real sluggish and lethargic." When Hamilton questioned Appellant about Annie, Appellant stated that she had been sedated earlier that day for an epilepsy diagnostic test. Hamilton later learned that Appellant had lied and Annie had never been taken to a doctor. Appellant previously had told Hamilton that she knew Palmer was on parole for injury to a child. Indeed, Appellant told Hamilton that she had to leave with Annie and Mahkayla when Palmer's parole officer visited because Palmer was not allowed to live with children.

---

[4]Appellant later told police officers that she voluntarily moved back into Palmer's home so she could find a job. Appellant stated Palmer was not living in the home at the time she moved back in, but that he moved in shortly thereafter.

Beginning on June 25, Appellant resumed her hospital hopping, visiting six different hospitals over a two-week period and claiming back injuries to get pain pills. On June 27, Appellant saw Palmer "backhand[]" Annie with his open hand so hard Annie fell into the refrigerator. Appellant stated she tried to leave after this incident but stayed after Palmer promised he would not do it again. On July 10, Appellant saw Palmer grab Annie by the shoulders and violently shake her, making her head "bob[] back and forth." Appellant stated that Annie was "fine" the next day.

## C. JULY 12

On July 12, Appellant, Palmer, Annie, and Mahkayla were on their way to see an orthopedic surgeon "for [Palmer] to have his hand evaluated for [an] accident he sustained at work." Annie began to have a seizure with her "right arm extended straight up, the feet extended," which lasted approximately one minute. Annie then went limp and stopped breathing. Palmer drove Annie to the closest emergency room.

The doctors determined that Annie had a "very large subdural hematoma" covering both sides of her brain along with bruising on her brain. The amount of blood on Annie's brain would have caused Annie to not behave normally such that a parent would know Annie "had a problem and they should seek medical attention." One of her eyes had a detached retina caused by "severe trauma." These injuries were not a result of the seizure. Indeed, Annie's spinal fluid contained blood caused by at least two prior traumatic brain injuries, occurring

6

both recently and as far back as "several weeks." The bleeding and bruising on her brain caused "the seizures, which then caused her not to breathe, which then caused the heart to stop." Because Annie's brain was "disastrously injured," her strength "had drained away trying to sustain itself," and "the seizure finished it."

Annie's condition was "cumulative" in that multiple episodes of "substantial injury" led to the tragic consequences. Indeed, if she had received all of her injuries at once, she would have died from them. If Annie had received medical attention after prior traumatic events and been removed from further trauma, she could have recovered. But because Annie was still recovering from prior traumas to her brain, she was more susceptible to additional and tragic injury.

## D. ANNIE'S REPRESENTED MEDICAL HISTORY

Annie's attending physician, Dr. James R. Matson, talked to Appellant and Holmberg (who Appellant had called once she arrived at the hospital) to get Annie's medical history. Appellant told Matson that Annie had had a fever of 102°–103° for the past three days and had been sleepy and "cold to [the] touch." Holmberg told Matson that Annie had not been able to walk since late June. Holmberg denied he told Matson that but did admit that he told Matson about Appellant's text in late June telling him that Annie could not walk because Appellant had failed to tell Matson about Annie's inability to walk. Holmberg told Matson that Annie began to have seizures in late May.

Appellant told Matson that Annie's first seizure occurred when she was eighteen months of age and lasted about one minute and that Annie had a 103°

7

fever, extended her right arm upward, extended her left leg, and foamed at the mouth. Annie returned to normal after the seizure. Appellant claimed she took Annie to her primary-care physician the next day but that he told Appellant the seizure was a result of the fever and that "no further evaluation or treatment was needed."[5] Appellant did not know the name of Annie's primary-care physician or where his office was located. Annie continued to have seizures every four days, but Appellant did not seek any medical help.

After arriving at the hospital, Palmer took Mahkayla. Palmer later brought Mahkayla back, and Mahkayla had a black eye.

### E. THE INVESTIGATION

During the ensuing investigation, Appellant shared more details about Palmer's violence toward Annie. Corporal Justin Graves interviewed Appellant on July 12 at the hospital. Appellant told Graves that Palmer had abused Annie on several occasions. On May 30, Annie was bounced to the floor off of a pedestal waterbed after Palmer moved "violently." Annie's head and neck "popped backwards" when she hit the floor, and Annie appeared "unbalanced and dizzy" when she got up. Appellant did not seek medical help for Annie because she was afraid Palmer would "do something" to Appellant. In mid-June, Palmer and Annie came out of the bathroom after Palmer gave Annie a bath, and

_____

[5]During a later police interview, Appellant stated that the diagnosis actually occurred during a phone call with the unnamed doctor.

8

Appellant saw a cut on Annie's foot with a BB lodged in the cut. Appellant confronted Palmer but did not take Annie to the doctor because she was scared of Palmer. On July 10, after Palmer gave Annie a bath, Appellant saw Palmer "forcefully slam" Annie's head into the door frame as they were leaving the bathroom. Annie again was unbalanced and dizzy. Appellant repeatedly told Graves that Palmer broke her arm on July 11 when he jerked her arm. Appellant told Graves that she had gone to a doctor to have her arm checked, which he believed because she was wearing a cast on her arm at the time of the interview. In fact, Graves noticed that Appellant "was worried about her injuries and not so much about what was going on in the other room [to Annie]."

Detective Barry Moore spoke with Palmer at the police station on July 12. Palmer told Moore that he was a "monster" because of how he treats children. Palmer told Moore that he hit Annie on the head with a belt. When Palmer demonstrated how he hit Annie, "it shook [the] table and the walls in [the] interview room." Palmer also discussed the BB in Annie's foot but stated that Appellant held Annie down while he dug the BB out.

Moore arrested Palmer and then brought Appellant to the police station to be interviewed.[6] As she had with Graves, Appellant "talk[ed] a lot about herself," did not "go right into the details of what happened to Annie," and focused on what

---

[6]The videotape of this interview was played for the jury during the guilt-innocence portion of Appellant's trial.

happened to her at Palmer's hands.  Appellant mentioned the BB incident to Moore, but said that Palmer told her to take Annie to the hospital and then changed his mind.  Appellant remembered that the BB Palmer dug out of Annie's foot while Appellant held Annie down was gold.

Appellant discussed the June seizure Annie had that left her unconscious for sixteen hours.  Appellant stated that when Annie woke up, she had problems speaking, could not understand much of what was said to her, could not walk, and indicated that her head hurt.  Although Appellant admitted she had chances after this seizure to get help for Annie, she did nothing because she was scared and she was worried about "our clothes and stuff."  Annie could not walk on her own after this seizure and never recovered her ability to walk according to Appellant.  Annie's "comprehension was a little slow," she would throw up occasionally, and was able to use only one arm after the mid-June seizure. Appellant admitted that she knew Annie had a head injury and that something was "seriously wrong" when Annie started having seizures in early June.  In fact, Appellant stated that every time Annie had a seizure, she knew there was "something wrong" and she was "hoping and praying this wouldn't be the end." Even though Palmer would tell Appellant there was nothing wrong with Annie, Appellant stated she knew something was wrong.

Appellant either did not know why she failed to get help for Annie, even though she knew Annie needed medical attention, or blamed Palmer's efforts in stopping her from leaving, including taking the battery out of her cell phone and

10

screwing the house windows shut. Additionally, she wanted to get away from Palmer "without having the whole world in on it." At the end of the interview, Appellant said she could call Palmer's father to bring some clothes to her at the police station because she was upset she didn't have any clothes.

On July 22, an investigator with the Texas Department of Family and Protective Services (DFPS), Sky Gaeta, went to the hospital to talk to Appellant. Appellant, as before, could not give Gaeta any information on who Annie's primary-care physician was. Appellant told Gaeta that Palmer had abused her and that she "liked [Palmer], but he got on her nerves sometimes." Appellant also recounted for Gaeta that, on June 26, she had seen Annie lying on the bed "unconscious" and that Palmer told her Annie would be unconscious for sixteen hours. Appellant tried to wake Annie up, but she would not respond. Appellant and Palmer "went about their day, went to sleep that night." At 2:00 a.m. on June 27, Annie woke up, but "could not talk, . . . she could not walk[,] and . . . she could not use her right arm." On July 1, Annie could stand on her own but told Appellant "it would hurt whenever she would go to sit down." Appellant reported that Annie previously had daily seizures on June 16 through 19 and that after Annie woke up on June 27, "she would have seizures daily and many days she was having multiple seizures a day." Appellant reported that during the night of July 10, Annie began crying due to a nightmare. Appellant did not get up to comfort her daughter because she was "too tired," so Palmer went to check on her when Annie continued to cry. Appellant opened her eyes to witness Palmer

11

"violently shaking" Annie. Appellant told Palmer he was going to hurt Annie and that he needed to come back to bed. Appellant did not get up to check on Annie after this incident because she was "too sleepy." Appellant told Gaeta that she did not leave Palmer because she was afraid. Based upon her discussion with Appellant, Gaeta believed Appellant was smart.

## F. APPELLANT ARRESTED

On July 22, Detective Moore arrested Appellant. One of her cellmates was Melissa Rivera. Appellant told Rivera that she saw Palmer swing Annie by the ankles until her head hit the television; however, Appellant did nothing because Palmer had drugged her. Appellant said she couldn't get away from Palmer because she did not have a phone, Palmer jammed the bedroom door "to where he could get in but [Appellant] couldn't get out," and the windows were made of fiberglass. Appellant also told Rivera that she held Annie down when Palmer used a knife to get a BB out of Annie's foot. Appellant never called the police about Palmer's abuse because she did not want to lose custody of Annie and Mahkayla. Rivera was struck by the fact that Appellant seemed concerned only about herself. Rivera finally confronted Appellant about her attitude and the fact that many of Appellant's stories seemed embellished. Appellant said "she wanted to play the system like the system was playing her."

Another cellmate of Appellant's, April Pollefeyt, recounted that Appellant stated Palmer drugged her, hit Annie in the head with a belt, and had thrown Annie into the television. Pollefeyt did not believe Appellant's assertion that she

had been drugged because the "needle mark" Appellant showed Pollefeyt "was really just like a spot or something, maybe a rash."

### G. APPELLANT'S TRIAL TESTIMONY

At trial, Appellant asserted that many of her statements to the police and the doctors were not true. For example, she stated that she and Palmer made up the BB story when Annie injured her foot on a piece of glass.[7] When asked why she "would [] make up a story that makes you sound like a horrible person for a baby that's just had an accidental injury," Appellant stated, "A friend of mine is writing a book, sir." She further testified that she and Palmer "cooked . . . many things up together" because they "think quite a bit alike at some times" based on the fact that their "birthdays are one day apart."

Appellant testified that Annie was never unconscious for sixteen hours and that she had never seen Annie have a seizure before July 12. Appellant also testified, however, that she was told Annie had a seizure in June. Appellant was firm that Annie was fine after Palmer backhanded and shook her and that Palmer told Appellant Annie did not need medical attention. Appellant admitted lying to Gaeta about how Palmer hurt her arm and clarified she broke her finger hitting Palmer after Palmer shook Annie on July 10. She further denied that she knew

---

[7]Interestingly, Appellant's nephews similarly had cut themselves on pieces of glass, which Appellant averred she stitched up without medical intervention. The subsequent investigation by DFPS into this incident was still pending at the time of the investigation into Annie's injuries.

13

Palmer had been convicted of injury to a child and was on parole. Appellant contended that Hamilton's testimony to the contrary was a lie. Appellant conceded that it "could [have been] an act" when she told Detective Moore that she knew that Annie had a head injury, that Annie was hurt, and that she needed to do something.

## II. SUFFICIENCY OF THE EVIDENCE

In her first issue, Appellant contends that the evidence is insufficient to show that her failure to seek medical attention for Annie caused serious bodily injury to Annie. In other words, there was no evidence "that Appellant's failure to treat Annie's injuries created a substantial risk of death or serious bodily injury above and beyond that sustained in any of the initial injuries at the hands of Palmer."

### A. STANDARD OF REVIEW

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Wise*, 364 S.W.3d at 903. Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our

14

judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). We must presume that the fact finder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Wise*, 364 S.W.3d at 903. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Isassi*, 330 S.W.3d at 638; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## B. INJURY TO A CHILD

Appellant was indicted for a knowing injury to a child by omission. A person commits this offense if she knowingly causes injury to a child by omission and has a duty to act.[8] Tex. Penal Code Ann. § 22.04(a). Parents have a duty to care for, to control, to protect, and to provide medical care to their children. Tex. Fam. Code Ann. § 151.001(a)(2), (3) (West 2008). Injury to a child is a "result of conduct" offense; thus, the State had to prove not only that Appellant knowingly failed to provide medical care to Annie, but also that she knowingly caused

---

[8]The statute allows conviction upon evidence of any one of three culpable mental states: intentional, knowing, or reckless. *See* Tex. Penal Code Ann. § 22.04(a). The State only charged Appellant with knowingly causing serious bodily injury.

15

Annie's injuries. *See Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985); *see also Johnston v. State*, 150 S.W.3d 630, 634–35 (Tex. App.—Austin 2004, no pet.). A person acts knowingly with respect to a result of her conduct when she "is aware that [her] conduct is reasonably certain to cause the result." Tex. Penal Code Ann. § 6.03(b) (West 2011). The requisite culpable mental state may be inferred from a person's acts, words, and conduct. *See Robledo v. State*, 126 S.W.3d 150,155 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

A person is criminally responsible for the result of conduct if the result would not have occurred "but for" the actor's conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient. Tex. Penal Code Ann. § 6.04(a) (West 2011). Thus, the result must be within the scope of risk of which the defendant is aware, which is met if an intervening cause is reasonably foreseeable. *See Williams v. State*, 235 S.W.3d 742, 764–65 (Tex. Crim. App. 2007). When the challenged conduct is an omission, proof that a defendant knowingly caused the result requires evidence that she was aware with reasonable certainty that the injury would have been prevented had she performed the act that was omitted. *Byrd v. State*, 112 S.W.3d 675, 677 (Tex. App.—Fort Worth 2003, pet. ref'd).

### C. APPLICATION

The jury heard evidence that Appellant had seen Palmer seriously injure Annie several times. During this time of abuse, Annie had suffered multiple

16

seizures with no medical attention. One of these seizures left Annie unconscious and later unable to walk or talk. Further, after some of the hits she absorbed, Annie would be dizzy and unstable. Hamilton testified that she saw Annie in late June, and she was lethargic, sluggish, and not her normal self. Appellant lied and told Hamilton that she sought medical care for Annie's seizures after Hamilton questioned Annie's condition. Though Appellant lived next door to a fire station and repeatedly went to hospitals herself seeking prescriptions for pain medications, Appellant did not seek medical care for Annie. The evidence established Appellant had the knowledge and ability to seek medical attention as she did so for Palmer, herself, and her mother.

Although Appellant testified that Annie was completely normal before she had the seizure in the car, this was contrary to what she stated in her videotaped statement, and her admitted habit of lying and exaggerating was well known. The jury weighed the credibility of the witnesses, including Appellant, and reasonably concluded that Appellant knew of Annie's injuries but failed to seek medical help. Appellant offered multiple excuses for that failure, including that she relied on Palmer to tell her when to do so, that she was physically restrained by Palmer from doing so, that she simply was too tired, or that she did not want to lose custody of her children. When confronted with her lack of concern for Annie, the jury heard that Appellant said she "wanted to play the system like the system was playing her."

17

As the sole judges of the credibility of the witnesses, the jury could have believed Matson and Moore and concluded with reasonable certainty that the ultimate injuries Annie suffered would have been prevented had Appellant performed the act that was omitted—obtaining medical attention over the time period she was being abused. Matson described bruises distributed over Annie's torso and limbs that were from three, different traumatic episodes. He further described blood visible in Annie's spinal fluid that indicated both recent trauma and trauma that occurred as much as four weeks before July 12. The CT scan and MRI both revealed old and new blood over Annie's brain, which indicated a more recent and an older event of trauma. Matson further explained that when there is a blow to the brain, the brain itself will typically look normal on day one. Annie's MRI, performed when she was admitted to the hospital, showed contusions to her brain leading Matson to conclude that "there had been significant trauma a few to several days or more prior to her presentation."

Matson concluded that "there had been some substantial traumatic events repeated over time that had been very damaging to this child's brain." The repeated damage to Annie's brain resulted in contusions and blood on her brain, which set up a scenario where seizures were extremely likely. The seizure most likely caused Annie's cardiac arrest. Matson was clear in how this scenario culminated: "I believe that the reason Annie went down and had the [cardiac] arrest, as a result of the seizure, which wouldn't ordinarily do that, is because her

18

brain was disastrously injured and her bodily strength had drained away trying to sustain itself. And the seizure finished it."

The jury viewed Appellant's videotaped interview and heard Moore's testimony. The statements Appellant made to Moore confirmed Matson's conclusions. Appellant told Moore that Annie was unconscious for sixteen hours after her seizure in June and never regained her ability to walk thereafter. Annie told Appellant that her head hurt. Appellant acknowledged that she knew something was "seriously wrong" with Annie and that she felt like each subsequent seizure could be "the end" for Annie. Yet she did not seek medical attention for Annie.

Matson was asked if the outcome for Annie would have been different if Appellant had sought medical attention for Annie. He responded, "Presumably there was some first event and had Annie been taken to get medical attention and that included getting her away from further trauma, it is likely she would have made a complete or nearly complete recovery." Matson recognized two separate actions that were needed to change the outcome of this tragedy, both of which were independently necessary: (1) take Annie for medical attention that Appellant knew was needed and (2) not return her to the circumstances where she was subjected to the physical abuse. The first act to save Annie is the allegation of this indictment. The evidence is sufficient that Appellant did neither. *See Thompson v. State*, 227 S.W.3d 153, 160–61 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *Johnston*, 150 S.W.3d at 636–37; *Byrd*, 112 S.W.3d at

19

678; *Payton v. State*, 106 S.W.3d 326, 330 (Tex. App. —Fort Worth 2003, pet. ref'd); *Hill v. State*, 881 S.W.2d 897, 903 (Tex. App.—Fort Worth 1994), *aff'd on other grounds*, 913 S.W.2d 581 (Tex. Crim. App. 1996); *cf. Dusek v. State*, 978 S.W.2d 129, 133 (Tex. App.—Austin 1998, pet. ref'd) (holding evidence insufficient to support injury-to-child conviction because child's broken leg treated same day as injury and no evidence treatment was delayed or recovery hindered by treatment timing).

The law does not require that Appellant have specialized and specific medical knowledge that Annie would suffer a heart attack leading to a coma as a result of significant and repeated head injuries followed by seizures. *Cf. Vasquez v. State*, 272 S.W.3d 667, 672 (Tex. App.—Eastland 2008, no pet.) (recognizing issue in injury-to-child case not whether defendant aware with reasonable certainty that injury to child would have been prevented but whether defendant knowingly caused injury by failing to provide adequate medical care). The law only requires that Appellant be reasonably certain that failing to get medical care for Annie would result in serious bodily injury to Annie. This the evidence does. Based on the cumulative force of the evidence recited above, the State sufficiently proved through circumstantial evidence that Appellant was reasonably certain that Annie would suffer severe medical consequences if Annie did not receive appropriate medical attention. *See Luna v. State*, 264 S.W.3d 821, 825–28 (Tex. App.—Eastland 2008, no pet.). Indeed, the severe medical consequences Annie suffered were within the scope of medical risk Appellant

20

could have reasonably foreseen based on the circumstantial evidence of Annie's prior medical condition before she was rushed to the hospital. *See, e.g.*, *Williams*, 235 S.W.3d at 764–65 (discussing criminal responsibility for result of conduct).

We overrule issue one.

### III. JURY ARGUMENT

Appellant argues in her second issue that the trial court erred by allowing the State to lower its burden of proof during closing jury arguments. As with her sufficiency argument, Appellant protests that the State argued it only had to prove Appellant knew Annie needed medical attention:

> And Annie did not get in that [boxing] ring knowingly. She got in that ring because her mother placed her in it until the final knockout punch was delivered. And we don't have to prove to you that [Appellant] knew that this is - - this was going to be the end result of Annie.
>
> [Defense Counsel]: Objection, Your Honor. I believe that is the law.
>
> [The State]: No, the law is - -
>
> THE COURT: I'll overrule the objection.
>
> [The State]: The law is we had to prove to you that she knew that Annie needed to seek medical attention. She needed to seek medical attention for Annie. And expert after expert told you that Annie's going to be showing signs and symptoms of what that man did to her, while her mother sat by and did nothing.

Appellant asserts that this argument lowered the State's burden of proof because the State failed to clarify that it also had to show that "Appellant knew or should have known that failure to get medical treatment could result in Annie's

21

debilitating heart attack or that Appellant's failure to seek medical attention caused any injury to Annie beyond what Palmer did to her."[9]  Appellant concedes that the jury charge correctly stated the applicable law.

To be permissible, the State's jury argument must fall within one of the following four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; or (4) plea for law enforcement.  *Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992), *cert. denied*, 510 U.S. 829 (1993).  Here, Appellant's counsel previously had argued that knowingly meant "your conduct is reasonably certain to cause the result. . . . But which one of you can tell me looking here you can be reasonably certain [Annie's current medical condition was] going to happen eight days later?"  Counsel then emphasized that Appellant is "not a doctor.  She doesn't know what seizures are."  The State was responding to this argument and reinforcing the idea that Appellant did not have to know the exact medical consequences of her omission; she only needed to be reasonably certain that an injury would result if Annie was not taken to a doctor.  Thus, this argument was permissible as a response to opposing counsel's argument that Appellant had to be aware of the exact medical consequences of her omission.

---

[9]Appellant also complains of nine other jury arguments made by the State that she asserts similarly lowered the State's burden of proof.  Appellant failed to object to these jury arguments on the grounds now raised; thus, she has forfeited these complaints, and we will not address them.  *See* Tex. R. App. P. 33.1(a)(1); *Wilson v. State*, 311 S.W.3d 452, 473 (Tex. Crim. App. 2010) (op. on reh'g).

22

We overrule issue two.

## IV.  CONCLUSION

Having overruled both of Appellant's issues, we affirm the trial court's judgment.


LEE GABRIEL
JUSTICE

PANEL:  WALKER, MCCOY, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  August 29, 2013

23